JAMES RONCHETTO, Respondent, v. NORTHERN CENTRAL COAL COMPANY, Appellant.

Kansas City Court of Appeals, April 6, 1914.

1. **NEGLIGENCE:** Mines and Mining: Cages. The plaintiff, a coal miner, sued to recover for personal injuries sustained, while being hoisted to the top of defendant's coal mine. The plaintiff, with five other miners, was being hoisted to the top of the shaft after their day's labor, when the hoist, which was in a defective condition, dumped the plaintiff out and he was injured. *Held,* that the plaintiff's injury was the direct result of a negligent breach of duty, which the defendant owed him.

2. **EVIDENCE:** Error: Refusal to Answer. A mere refusal of the trial court to hear an answer is not alone sufficient to con-

stitute error, but it is the duty of the party alleging error to indicate what the evidence is which he proposes to elicit.

3. **MINES AND MINING:** Statutes. Under Sec. 8456, R. S. 1909, it is the duty of owner or operator of a mine "to provide safe means of hoisting and lowering persons in a cage covered with boiler iron, so as to keep safe, as far as possible, persons descending into and ascending out of said shaft."

4. ———: **Knowledge of Defects.** Knowledge, actual or constructive, of a defect in appliances must be brought home to the employer before a liability exists.

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller,* Judge.

AFFIRMED.

*Willard P. Cave* for appellant.

*Dan R. Hughes, John R. Hughes* and *Hunter & Chamier* for respondent.

JOHNSON, J.—Plaintiff, a coal miner employed by defendant fell from a hoisting cage in which he was being lifted to the top of the mine and sustained personal injuries he alleges were caused by negligence of defendant. The averment of negligence in the petition is that defendant "negligently and carelessly failed to inspect said cages, and negligently and carelessly failed to repair them, and negligently and carelessly permitted said cages to remain in a loose, unsafe, dangerous and defective condition, and imperilling the lives and limbs of the employees employed in said mine while riding upon said cages . . . that by reason of the carelessness and negligence of defendant . . . in its failure to inspect, to keep in repair and to maintain its cages in a reasonably safe condition, he was injured," etc.

The answer is a general denial followed by pleas of assumed risk and contributory negligence. The

cause is here on the appeal of defendant from a judgment for $2500 recovered by plaintiff in the circuit court.

The principal contention of counsel for defendant is that the demurrer requested by him at the close of plaintiff's evidence, and afterward at the close of all the evidence, should have been given.

The injury occurred at 3:30 p. m., November 8, 1911, in the main shaft of defendant's "Mine No. 2" at Huntsville. Two hundred miners were employed in this mine and a double compartment hoist operated by a steam engine was used to carry them to and from the mine and to carry coal to the tipple at the top of the shaft. The two elevators or cages, as they are called by the witnesses, were covered with sheet iron and each had its floor constructed in a manner to permit the automatic dumping of each load of coal into a hopper at the top of the shaft, but to be firmly fixed in a horizontal position while the cage traveled up and down the shaft. Plaintiff and five other miners, having finished their work for the day, entered the north cage for transportation to the top, and plaintiff stood on the southwest corner of the cage floor which was hinged to the cage on the east side but detached on its other sides to allow it to swing downward and open towards the west in the dumping process. After the cager whose post was at the bottom of the shaft had given the signals to the engineer, apprising him that men and not coal were to be carried, the cage began its ascent at a speed requiring from twelve to fifteen seconds to reach the top of the shaft which was 77 feet deep. During the ascent, plaintiff fell out of the cage into the sump at the bottom which was covered with six or eight inches of water. From the top of the shaft down to a point about ten feet above the bottom, the shaft was boxed or curbed with heavy oak boards and this boxing rested upon a ring of heavy timbers called "the ring set." There was no boxing below the ring set. The

theory of the cause of plaintiff's fall urged by counsel for defendant is that he stood too near the entrance to the cage and in going upward his head, projecting beyond the inner side of the boxing, collided with the west timber of the ring set and he was caused to fall in the space between the cage floor and the wall of the shaft below the ring set. The contention of plaintiff is that he rode in safety until after the cage had passed the ring set and was entirely in the boxing and that his fall was caused by the sudden dumping of the floor which returned almost immediately afterward to a horizontal plane. No other occupant of the car was thrown therefrom but all testified that the floor did drop down at the west side a sufficient distance to admit the passage of plaintiff's body. They raised a great clamor by shouting and striking their lunch pails against the cage and the engineer stopped the cage when it was about midway in its ascent, but after it was known that plaintiff had fallen into the sump the cage was hoisted to the top without further misadventure. The floor of the cage rested on the dumping mechanism which, in turn, was supported by heavy timbers called the sills of the car. The sill on the east side sustained the principal shock and stress of the dumping process and was covered by an iron strap to protect the wood from wearing away under the blows of the "knuckle." This strap was bolted at each end to the sill and the evidence of plaintiff tends to show that the bolt at the north end had worked out and that the released end of the strap had worked around towards the east, to an extent to cause it to touch and drag along the boxing, while the other end remained firmly bolted to the sill. The men in the car testified that from the moment it entered the boxing they could hear the sound of metal scraping on wood and that the strap seemed to catch in the wood at the instant the floor dumped. It is not seriously contended that plaintiff did not fall from a much greater height than the ring

set and that the cage had passed entirely within the boxing, but defendant, in support of its theory of the cause of his fall, points to the facts that no one saw him when he pitched headlong into the shaft and that some of the occupants of the car did discover his plight at the moment when, as one of them states, "his foot was hanging on the cage between the cage and the curbing; his body was down and he had his foot hanging there." It is argued from this evidence that in falling, in consequence of a blow from the ring set timber, his foot and ankle were caught as the floor of the car ascended past the ring set and as the east and west dimension of the shaft inside the boxing was only about three inches greater than the width of the car floor, he was dragged upward by the foot a distance of fifteen or twenty feet until his foot became disengaged and he plunged to the bottom. Expert witnesses for defendant testified that the floor could not have dumped inside the boxing owing to the lack of room for such operation which required a movement of the floor westward a distance of twelve or fifteen inches beyond the line of the curbing and further state that the loosened iron strap could not have had any effect upon the dumping apparatus.

We are asked by counsel for defendant to accept this evidence as conclusive and to declare as a matter of law the physical impossibility of there being any causal relation between the loosened and displaced strap and the fall of plaintiff. The evidence of plaintiff tends to show that the walls of the curbing had been allowed to become uneven and irregular so that at some places the well was six inches or more wider than the cage and there is room for a reasonable inference that such space would permit the floor to be partially dumped. Further it is shown that the perpendicular guides for the car had become out of line in places, permitting the cage to sway from one side of the shaft to the other. In addition to the facts men-

tioned, i. e., that the strap bolt was gone, that the strap was heard and felt to scrape along the east wall of the boxing and finally seemed to catch in the wood, and that all of the men on the car state that the floor did dump, we find evidence to the effect that large lumps of coal had fallen during prior ascents of that cage and that such things could not have occurred without partial dumping of the floor. Further, the theory of defendants is met by the inharmonious fact that the many serious and painful injuries inflicted on plaintiff were upon his sides and back, and that his head and feet escaped all but trifling injuries—a result one would not expect from a terrific blow on the head, followed by the dragging and crushing of his foot and ankle between the heavy car and the timbers of the shaft.

After the cage reached the top and the miners alighted, it was lowered to the bottom and plaintiff was placed in it and carried to the top. There is evidence tending to show that the cage was continued in use without repairs and much stress is laid on this evidence in defendant's argument that the loosened strap did not and could not have caused the injury. Complaint is made by counsel for defendant of a ruling of the court which he claims prevented him from showing on cross-examination of one of plaintiff's witnesses that the cage had been continued in safe use after the injury, and the rule is invoked that "evidence that the machine which caused the accident was in good condition at the time of the trial and at other times shortly before and after the accident, and that it worked properly before and after the accident is admissible as having a tendency to show its condition and how it worked at the time of the accident. Such evidence may even be conclusive in the master's favor." [4 LaBatt on Master & Servant, 4829.] This rule may be conceded and the relevancy of the question the court refused to permit the witness to answer also may be acknowl-

edged but it does not follow from these concessions that the adverse ruling necessarily constituted reversible error. The question which was asked at an early stage of the trial was, "And that cage has been in use?" Counsel for plaintiff objected on the ground that the question "is improper. They may have fixed it (the cage) since that time and it may not be the same cage." The objection was sustained and counsel for defendant merely saved an exception without indicating in any manner the nature of the proof he purposed making and to which the question was addressed.

As was said by the Supreme Court in State v. Arnold, 206 Mo. l. c. 597, and by this court in Bowman v. Mining Company, 168 Mo. App. l. c. 707: "A mere refusal to hear an answer is not alone sufficient to constitute error, but it is the duty of the party alleging error to indicate what the evidence is which he proposes to elicit."

This rule is especially applicable in instances, such as the present, where the particular fact to which the question relates may or may not be endowed with probative value. The fact alone that the cage had been continued in use would tend to prove nothing unless coupled with additional proof that its condition had not been altered and that such subsequent use had been successful and reasonably safe. At the time of the ruling in question no such proof had been introduced and without any intimation that it would be forthcoming, the court was justified in assuming that the question was directed merely to an isolated fact of no evidentiary significance. This assignment of error must be ruled against defendant.

Passing to a consideration of the demurrer, we find the evidence of plaintiff relating to the cause of the injury is reasonable and substantial and should not be denounced in law as opposed to the conceded physical facts of the situation. That plaintiff fell from the car after it had passed the ring set is a fact about

which there is little room for controversy. He stood at the western or opening side of the floor and there is only one possible way in which he could have been removed from the car after it had passed the ring set, i. e., by the opening of the floor a sufficient space to admit the passage of his body between its edge and the curbing. Without such dropping of the floor the space between it and the wall could not have been over six inches, a distance too narrow to allow the passage of the body of a man. The theory of defendant that plaintiff's head collided with the ring set and that he was dragged upward by the foot is too unreasonable to receive much consideration, in view of the absence of serious injury to his head and feet. Instead of being opposed to physical facts, the testimony of plaintiff and his witnesses that he did not fall until the cage had passed the ring set is the only view of the injury that may be reconciled with them, as is also their assertion that a partial dumping of the floor was the cause of his fall.

The testimony of defendant's experts that the floor could not have dumped is met by the stubborn fact that it did dump, and when analyzed, is found to be predicated of a state of facts which the evidence of plaintiff shows was nonexistent. If it had been indisputably shown that the guides were in proper alignment, that the walls of the enclosure were regular and of even surface, and that not over an inch or an inch and a half of play was allowed the cage on each side, the opinion of these experts would appear to be well-founded; but under the hypothesis that the guides were out of line, that the walls had become irregular and uneven, so that at times the cage would be in a place where it would have as much as six inches of play, we think the jury were entitled to infer that the floor could be partially dumped by the force engendered by the catching of the projecting strap on the boxing it was scraping. Nor may such conclusion be held to

be disproved by the evidence that the cage was continued in use without a repetition of such an incident. In the first place, it is not conclusively shown that the defect was not repaired. We are not bound by the testimony of defendant's witnesses on that point and their credibility and the reasonableness of their testimony are issues of fact for the jury to determine. And if not repaired the fact that the strap which had mobility in some degree did not continue to scrape along the wall might indicate nothing more than that the loose end had been shifted back to a different and less dangerous position. Certainly it cannot be said to refute conclusively the testimony of so many apparently credible witnesses.

In the statutes pertaining to mines and safety of miners (Sec. 8456, R. S. 1909) it is made the duty of the owner or operator "to provide safe means of hoisting and lowering persons in a cage covered with boiler iron, so as to keep safe, as far as possible, persons descending into and ascending out of said shaft." So far as the purposes of the present inquiry are concerned, this provision may be regarded as a statutory expression of an elementary common law rule. Having provided a hoisting cage for the transportation of its miners, it was the duty of defendant to exercise reasonable care to maintain the cage in a reasonably safe condition for use. Defendant was not an insurer of the safety of plaintiff and the mere fact that plaintiff was injured while in the discharge of the duties of his employment by a defect in the cage would not, of itself, raise an inference of negligence. The question is whether or not defendant exercised proper care to discover the presence of defects in the cage that would enhance the natural risks of the service. Knowledge, actual or constructive, of a defect in appliances must be brought home to the employer before a liability exists. [3 LaBatt on Master & Servant, 1027; Wojtylak v. Coal Co., 188 Mo. 260; Glasscock v. Swofford, 106

Mo. App. 657; Kramer v. Manufacturing Co., 120 Mo. App. 247.]

We hold the evidence of plaintiff is sufficient to support an inference that the injury was caused by negligence of defendant in the inspection of the cage or in failing to repair the defect after its discovery. Reference to a single incident will suffice to show that the bolt must have been gone for a long time and that the strap had been scraping the floor and causing it to dump. The testimony of the cager, who was in a position to know, that large lumps of coal had been falling from the ascending cage for quite a long period is compatible with no other conclusion than that the same cause that dumped the floor to the injury of plaintiff had been in operation and was manifested by results which could follow only from a partial dumping of the floor. The jury were entitled to the inference that the exercise of reasonable care by defendant would have resulted in the discovery and repair of the defect.

We conclude that the evidence of plaintiff discloses that his injury was the direct result of a negligent breach of such duty. The demurrer to the evidence was properly overruled.

We have sufficiently answered objections to the instructions in what we have said. The case was tried without prejudicial error.

Affirmed. All concur.